NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0318n.06

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 25-3381/3383

| | | |
|---|---|---|
| DAVID M. SMITH, | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| CYNTHIA DAVIS, Warden, | ) | |
| Respondent-Appellee. | ) | |

**FILED**
Jul 02, 2025
KELLY L. STEPHENS, Clerk

Before: COLE, CLAY, and THAPAR, Circuit Judges.

The court delivered an ORDER. THAPAR, J. (pp. 18–40), delivered a separate dissenting opinion.

A jury convicted David Smith in state court of attempted murder and other crimes based on the victim's identification of Smith as her assailant. We later determined the state violated Smith's due process rights because the victim's identification was obtained through unduly suggestive means and lacked any strong indicia of reliability. *See Smith v. Davis*, No. 23-3604, 2024 WL 3596872, at *1 (6th Cir. July 31, 2024), *cert. denied*, 145 S. Ct. 93 (2025). Accordingly, we ordered the district court to release Smith on a writ of habeas corpus unless the state proceeded to prosecute him within 180 days without utilizing the suggestive identification. *Id.* at *12.

Smith proceeded to trial a second time, and again, a jury convicted him. After retrial, Smith moved to enforce the conditional writ, and the district court concluded that the state failed to comply with our order not to utilize the suggestive identification and issued an absolute writ of habeas corpus. The district court also denied the government's motion for a stay pending appeal but imposed an "administrative stay" delaying Smith's release to permit us time to decide whether

a stay is warranted. The warden appealed and moved to stay the district court's order granting Smith an unconditional writ. Smith moved to vacate the district court's administrative stay. For the following reasons, we deny the warden's motion, grant Smith's motion, order the district court to dissolve the administrative stay, and instruct the district court to implement its order releasing Smith from custody, effective immediately.

I.

Our July 31, 2024, decision details this case's factual background. *See id.* at *1–4. To summarize, in October 2015, Quortney Tolliver was attacked with a hammer at her home and hospitalized for severe head injuries. *Id.* at *1. During the investigation, a police officer showed Tolliver a photograph of Smith, and, over a span of several months, he told Tolliver that Smith was her assailant. *Id.* at *1–3. Despite the officer's improper attempts to obtain an identification from Tolliver, Tolliver could not recall anything about the day she was attacked. *Id.* at *2–3. Eventually, based on a dream about the attack, Tolliver declared that Smith was the perpetrator. *Id.* at *3. The prosecution presented Tolliver's eyewitness identification to the jury during the state court trial, and the jury convicted Smith of attempted murder, felonious assault, aggravated robbery, and aggravated burglary. *Id.* at *1.

Smith subsequently petitioned for a writ of habeas corpus in February 2020, which the district court denied. *Id.* at *4. Smith appealed, and we concluded that Smith's conviction was based on an unduly suggestive and coercive identification. *Id.* at *12. We thus ordered "the district court [to] issue Smith a writ of habeas corpus unless the state proceed[ed], within 180 days, to prosecute Smith in a new trial without utilizing Tolliver's identification of Smith, which shall be suppressed and excluded from evidence." *Id.* As directed by this court, the district court issued a mandate that conditionally ordered Smith's release from custody on March 13, 2025, unless the

state prosecuted Smith "in a new trial without utilizing Tolliver's identification of Smith[.]" (Order, R. 35, PageID 3074–75.)

In February 2025, the state court retried Smith. During retrial, the state elicited testimony from Tolliver about the day of the attack. Specifically, the state asked Tolliver to describe and identify the person she saw outside her house immediately before the attack. Tolliver testified that she let Smith into her house and then described the attack. Ultimately, a jury convicted Smith. Arguing that his retrial suffered from the same constitutional defect as his initial trial, Smith quickly moved the district court to enforce the conditional writ as absolute and release him from state custody.

On May 12, 2025, the district court granted Smith's motion to enforce the writ as absolute. It reasoned that the state court proceedings violated this court's order proscribing Tolliver's improper identification of Smith because the record left "no doubt about the effect of her testimony—she identified Mr. Smith as the person who hit her in the head with [a] hammer." (Op. & Order, R. 52, PageID 3909). The following day, noting the state intended to file a motion for a stay pending appeal, the district court issued a seventy-five-day administrative stay as a minute entry in its docket, delaying Smith's release from custody until July 28, 2025.

The state subsequently moved for a stay pending appeal. After weighing the necessary factors, the district court declined to issue a stay pending appeal yet maintained its administrative stay to give this court "appropriate time to review the record and the parties' arguments for a stay pending appeal in light of the significant competing interests at stake." (Op. & Order, R. 58, PageID 3971). We know of no procedural basis for this action.[1]

---

[1] In the rare times it may be appropriate for a court to enter an administrative stay, it would be unusual for a court to enter such a stay for the benefit of a completely different court—which could enter its own stay if one were required—as was done here.

3

The warden appeals the district court's grant of Smith's motion to enforce the conditional writ. As part of her appeal, the warden moves for a complete stay of the district court's order for the pendency of its appeal, and Smith moves for his immediate release from custody. Separately, Smith appeals the district court's administrative stay and moves this court to vacate the stay. The warden opposes Smith's motion. At this stage in the proceedings, we consider only the pending motions.

## II.

Both parties move for relief related to the issue of Smith's release from custody pending appeal: Smith asks us to vacate the district court's existing administrative stay and order his immediate release, while the warden requests that we grant a stay of the district court's judgment for the entirety of its appeal, which would necessarily preclude Smith's release. Because an administrative stay is a rare procedural device used to enable a court "to make an intelligent decision on the motion for a stay pending appeal," *United States v. Texas*, 144 S. Ct. 797, 798–99 (2024) (Barrett, J., concurring), and the district court's stated justification for the administrative stay was to give us time to review whether to issue a stay pending appeal, we focus on the warden's motion for a stay pending appeal.

"The taking of an appeal does not by itself suspend the operation or execution of a district-court judgment or order during the pendency of the appeal. Thus, the appellant who desires a stay of the lower federal court's action while the appeal is pending must seek an independent stay[.]" Wright & Miller, 16A Fed. Prac. & Proc. Juris. § 3954 (5th ed. 2025) (citation modified). "[I]nstead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself" by, for example, "temporarily divesting an order of enforceability." *Nken v. Holder*, 556 U.S. 418, 428 (2009). Representing "an intrusion into the ordinary processes of administrat[ive]

4

and judicial review," a stay is accordingly "not a matter of right, even if irreparable injury might otherwise result to the appellant[.]" *Id.* at 427 (citation modified). Rather, a stay serves as "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Id.* at 433 (citation modified). "[A] reviewing court may not resolve a conflict between considered review and effective relief by reflexively holding a final order in abeyance pending review." *Id.* at 427.

Federal Rule of Appellate Procedure 23(c) generally requires releasing a habeas petitioner pending review of the decision ordering release. It provides that, during appeal, the petitioner "must . . . be released on personal recognizance, with or without surety." Fed. R. App. P. 23(c). This rule "undoubtedly creates a presumption of release from custody in such cases[.]" *Hilton v. Braunskill*, 481 U.S. 770, 774 (1987). We afford "a presumption of correctness" to the district court's "initial custody determination. *Id.* at 777. Here, the district court ordered release and then determined that the state was not entitled to a stay pending appeal under traditional stay factors.[2]

Accordingly, the language of Rule 23(c) and the "general standards governing stays of civil judgments" guide our decision whether to stay the release of a habeas petitioner pending the state's appeal. *Id.* at 776–77. The traditional factors for the issuance of stay are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (quoting *Hilton*, 481 U.S. at 776). We balance the factors together, and no single factor dictates the outcome. *See DV Diamond Club of Flint, LLC v. Small Bus.*

---

[2] While the district court ordered a seventy-five-day administrative stay delaying Smith's release, it did so to give this court time to review the parties' arguments related to a stay pending appeal.

*Admin.*, 960 F.3d 743, 746 (6th Cir. 2020) (order). In the habeas context, we consider several additional factors: the petitioner's risk of flight, any danger to the public, and the state's interest in continuing custody.[3] *See Hilton*, 481 U.S. at 777. As the party seeking a stay, the warden bears the burden of showing she is entitled to one. *See Nken*, 556 U.S. at 433–34.

After considering each stay factor in turn, we agree with the district court that the warden fails to meet her burden and is not entitled to a stay pending appeal.

### A.

We begin with the warden's likelihood of success on appeal. The warden challenges the district court's jurisdiction to issue Smith an unconditional writ of habeas corpus. While jurisdiction is ordinarily a threshold issue, *see United States v. Yeager*, 303 F.3d 661, 664 (6th Cir. 2002), determining its existence here requires a thorough review of the record, including the state court proceedings below. Therefore, while we must carefully consider the merits of the warden's argument when reviewing this factor, we do not render a final decision before the parties have filed their briefs in the appeal pending before us. Instead, as is normal practice when considering a motion for a stay pending appeal, we "predict[] rather than decid[e]." *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 656 (9th Cir. 2021).

We thus examine the warden's jurisdictional argument to determine, at this stage, only whether the warden has established a strong likelihood of success on appeal. She has not. We offer a fuller explanation than we otherwise would to refute the dissenting opinion's mischaracterization of this order as a "severe and unprecedented intrusion onto state sovereignty." (Dissent at 1.) It is not. This order simply reflects our assessment that, for the following reasons,

---

[3] The parties did not separately brief these factors below or in their pending motions. Accordingly, to the extent that we consider these factors, we fold them into our analysis of the state's interest and the public's interest, respectively.

the warden has failed to persuade us of the absence of federal jurisdiction such as to justify "an intrusion into the ordinary processes of [] judicial review." *Nken*, 556 U.S. at 427.

A conditional writ of habeas corpus delays a defendant's release "to afford the State an opportunity to remedy the specific constitutional violation identified by the [federal] court." *Jennings v. Stephens*, 574 U.S. 271, 285–86 (2015) (Thomas, J., dissenting); *see also Gillispie v. Warden, London Corr. Inst.*, 771 F.3d 323, 327 (6th Cir. 2014) ("[T]he very purpose of a conditional writ is to compel the state to vacate a judgment entered in violation of the federal Constitution."). If the state fails to satisfy the writ's condition within the time set, the writ "springs to life" and requires the petitioner's immediate release from custody. *Gentry v. Deuth*, 456 F.3d 687, 692 (6th Cir. 2006); *see also Wilkinson v. Dotson*, 544 U.S. 74, 87 (2005) (Scalia, J., concurring) ("Conditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one, and the consequence when they fail to do so is always release.").

After a federal court issues a conditional writ, federal habeas jurisdiction generally persists until "the unconstitutional judgment is gone." *Eddleman v. McKee*, 586 F.3d 409, 413 (6th Cir. 2009). A state can vacate the unconstitutional judgment in two ways. First, the state can satisfy the habeas court's condition to avoid issuance of the writ. *See Gentry*, 456 F.3d at 692 (citing *Pitchess v. Davis*, 421 U.S. 482, 490 (1975) (per curiam)). In these cases, the habeas court retains jurisdiction to assess whether the state truly complied with the writ's terms because, as we have previously observed, "conditional writs 'would be meaningless' if a habeas court could not determine compliance with them and order sanctions accordingly." *Mason v. Mitchell*, 729 F.3d 545, 549 (6th Cir. 2013) (quoting *Satterlee v. Wolfenbarger*, 453 F.3d 362, 369 n.5 (6th Cir. 2006)). When a state fails to comply with the conditions set forth in the writ, a district court retains

jurisdiction to issue an unconditional writ. *See, e.g.*, *D'Ambrosio v. Bagley*, 656 F.3d 379, 385 (6th Cir. 2011); *Satterlee*, 453 F.3d at 369.

Alternatively, in certain circumstances, a state can release the petitioner and vacate the unconstitutional judgment. *See Eddleman*, 586 F.3d at 413. After release, the state is generally not precluded from beginning prosecution anew based on the underlying indictment. *See Fisher v. Rose*, 757 F.2d 789, 791 (6th Cir. 1985). But the state must first release the petitioner and vacate the unconstitutional judgment. *D'Ambrosio*, 656 F.3d at 387. "What vacates a conviction is an entry in the court docket, which—depending on the state's procedures—is likely made through a court order, or clear actions by the court signifying a vacatur." *Id.* at 388.

Here, the warden does not attempt to argue that the state complied with the conditional writ during retrial, but the dissenting opinion draws this conclusion. It concludes, in part, that our jurisdiction is extinguished because the state complied with the writ. But at this stage in the proceedings, the warden, as the moving party, must persuade us of her likelihood of succeeding on the merits, and she has not done so. *See Nken*, 556 U.S. at 434. The warden did not advance this argument in her motion for a stay pending appeal, so we need not address it at this time.

For this reason, we also decline to address, in full, the dissenting opinion's contention that Smith presents "a new legal theory" that "Tolliver's testimony that she saw Smith on the morning of the attack amounts to a claim that Smith attacked her." (Dissent at 5.) In any case, we are unpersuaded by this argument at this preliminary stage in the proceedings. Prior to the suggestive identification, Tolliver said she had no memory of the day of the attack. *See Smith*, 2024 WL 3596872, at *1. So, this court ordered that the state "prosecute Smith in a new trial without utilizing Tolliver's identification of Smith" and that the identification "be suppressed and excluded from evidence." *Id.* at *12. During the retrial, Tolliver identified Smith as the person she allowed

into her home in the moments before she was struck and rendered unconscious. As the district court observed, the effect of that testimony was to identify Smith "as the person who hit her in the head with [a] hammer." (Op. & Order, R. 52, PageID 3909.) So, contrary to the dissent's characterization, Smith's main argument—that the state failed to comply with this court's writ by again utilizing the suggestive identification during his retrial—does not predominantly concern a new claim where state remedies have not been exhausted. *Cf. Pitchess*, 421 U.S. at 490.

Instead, the warden argues that Smith's 2016 conviction was vacated prior to his retrial. "Because Smith's current custody is the result of an entirely new conviction effective March 12, 2025," she contends that "the district court lacks authority to take any action regarding this Court's prior mandate, or to affect Smith's current custody." (Appellee Response, D. 10, at 7–8.) This includes the district court's review of noncompliance in Smith's retrial and, based on that noncompliance, its decision to issue an unconditional writ of habeas corpus.

The warden concedes that "the trial court did not enter upon its docket any order of vacatur of Smith's initial conviction before proceeding with the retrial." (*Id.* at 11.) But as the warden correctly notes, the absence of a docket entry is not dispositive. While a state court entering a written order is "better practice," we have indeed found vacatur absent written orders in certain circumstances. *Eddleman*, 586 F.3d at 412. We consider the totality of circumstances to determine whether vacatur has occurred. *See D'Ambrosio*, 656 F.3d at 388.

The warden fails to establish that the totality of the circumstances shows that the state vacated Smith's conviction before retrial. As the district court noted, the only evidence of vacatur of Smith's original conviction in the record is the setting of bond upon Smith's transfer from state prison to the local jail. While setting bond supports finding vacatur, *see Eddleman*, 586 F.3d at 412, it is not dispositive. The issuance of bond does not necessarily imply the absence of an

9

underlying conviction. A court may, for example, require that a defendant post bond when staying the execution of the defendant's sentence pending appeal. *See* Fed. R. Crim. P. 38; *see also* Fed. R. App. P. 23(c) (noting that, pending review of a decision ordering a prisoner's release, the prisoner may be released "with or without surety"). Consequently, that fact alone cannot overcome the totality of the circumstances, which as the district court correctly found, "points in the direction that [Smith's] conviction was *not* vacated." (Op. & Order, R. 52, PageID 3896.)

> These facts include: (1) no vacatur appears on the docket; (2) no arraignment occurred; (3) [] Smith was not re-arrested; (4) no evidence of an agreement by the parties that the first conviction was vacated appears in the record; and (5) the prosecution and the State trial court acted as if the prior conviction was not vacated.

(*Id.*) Consistent with the district court's factual findings, the pretrial hearing—where bond was set—does not reveal the parties' clear understanding that Smith's original conviction had been vacated.

The dissenting opinion reasons that the setting of a trial date and the retrial itself also serve as evidence of vacatur. (Dissent at 7–8.) It is unclear how that understanding of the operation of conditional writs is compatible with our caselaw. The bar on a federal habeas court's maintenance of "continuing supervision over a retrial" relates to any new issues "neither raised in nor considered by state courts during the course of [the] direct appeal from the first conviction or by the federal courts during the proceedings resulting in issuance of the conditional writ of habeas corpus." *Pitchess*, 421 U.S. at 490, 487. But our binding precedent makes plain that a federal court retains jurisdiction to determine whether a party complied with the terms of a conditional writ. *See, e.g.*, *Mason*, 729 F.3d at 549–50. The conditional writ we issued required the state to prosecute Smith within 180 days without utilizing the suggestive identification. The dissenting opinion takes the remarkable position that a state court can extinguish our jurisdiction to enforce a writ by merely taking certain steps toward complying with the writ—such as by setting a trial date and retrying

Smith—and thus preclude us from assessing whether the new judgment is "infected by the same constitutional violation that justified the order's entry in the first place." *Jennings*, 574 U.S. at 288 (Thomas, J., dissenting). "Such an interpretation of habeas judgments would render the writ hollow." *Id.*

Additionally, both the warden's and the dissenting opinion's reliance on *Eddleman* is misplaced. In *Eddleman*, we held that the district court lacked jurisdiction to order the petitioner's release and bar re-prosecution because, even without a docket entry, the petitioner's underlying conviction had been vacated. 586 F.3d at 411–13. We highlighted that, during a state-court hearing, "counsel for both Eddleman and the State represented to the court, and the court itself agreed, that Eddleman's unconstitutional conviction had been vacated." *Id.* at 412. "That Eddleman was later rearraigned and afforded a bond hearing in state court [] confirm[ed] that his prior conviction had been set aside." *Id.* The issuance of bond in *Eddleman* therefore reinforced what was already a clear understanding between the parties and the trial court: the original conviction had been vacated. *Id.*; *see also Gillispie*, 771 F.3d at 329 (finding "clear actions" signifying vacatur where the state appellate court's opinion "expressly stated that '[petitioner's] conviction and sentences are Vacated'"). No such evidence of a clear understanding appears here.

The dissenting opinion's reliance on *Fisher* to support finding vacatur is equally misplaced. Decided nearly four decades ago, *Fisher* reviewed, on the merits, whether the district court abused its discretion in barring a petitioner's retrial. 757 F.2d at 792. While *Fisher* remains binding precedent, our later decisions in *D'Ambrosio* and *Eddleman* clarify the proper analysis for evaluating whether vacatur occurred and extinguished federal habeas jurisdiction. Those cases require us to review the totality of circumstances to determine whether vacatur has occurred. *See D'Ambrosio*, 656 F.3d at 388. Therefore, even if *Fisher* stands for the proposition that appointing

counsel and setting bond and a trial date are persuasive facts, such facts are not dispositive, as we have already explained. We must consider the totality of the circumstances, and the totality does not show vacatur here. *Fisher* thus does not control the outcome.

Furthermore, unlike *Fisher*, here, it is not obvious that Smith was in fact released. The trial court's judgment entry ordering Smith's remand from state prison to the local jail does not itself show definitive release when additional evidence in the record suggests otherwise. (*See* J. Entry, R. 47-3, PageID 3793.) As the district court noted, Smith's "warrant for removal" issued by the state court clerk cited provisions of state law "refer[ring] to a convicted felon and appl[ying] to the housing and transportation of a person following a conviction for a felony[.]" (Op. & Order, R. 52, PageID 3893.) The warrant therefore appears to be "an order to transport [] Smith from State prison to the local jail so that he can be retried" and not a document releasing Smith from custody or vacating his original conviction. (*Id.* at PageID 3894.)

Attempting to explain away the lack of a clear vacatur, the warden argues that, since federal courts rarely issue conditional writs, it was "understandable that some confusion over the practical effects of [our] order may have existed." (Appellee Response, D. 10, at 11.) She also attributes Smith's warrant for removal to a ministerial error made by the clerk. But, as we have previously made clear, "[s]tatements of confused parties and judges do not vacate convictions." *D'Ambrosio*, 656 F.3d at 388. We require "clear actions by the court signifying vacatur." *Id.* As the district court correctly determined, the record before us lacks evidence of such clear actions. *See id.*

Finally, the dissenting opinion's reasoning that retrial without vacatur would violate the Double Jeopardy Clause misunderstands how conditional writs operate. A conditional writ "delay[s] the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court." *Hilton*, 481 U.S. at 775. As such, the

state's retrial of a petitioner pursuant to a conditional writ does not represent a "second trial." (Dissent at 12.)  Rather, the retrial gives states "an opportunity to cure their constitutional errors, out of a proper concern for comity among the co-equal sovereigns." *Gentry*, 456 F.3d at 692.  It is not a second trial, but an opportunity to retry a petitioner without a constitutional defect. *See id*. The dissenting opinion identifies a "serious constitutional problem" where none exists: if retrial pursuant to a conditional writ violated the Double Jeopardy Clause, we would simply issue an absolute writ for every successful habeas petitioner and require states to begin prosecution anew. (Dissent at 12.)

At this stage, we are therefore unpersuaded by the warden's arguments that the district court lacked jurisdiction over these proceedings.  A state cannot labor to comply with a federal writ's terms and then cry vacatur to extinguish federal jurisdiction after a habeas court concludes that it fell short of compliance.  Finding the warden's likelihood of success on appeal slim, we conclude that this factor counsels against granting the warden's requested stay.

B.

We next consider whether the state would suffer irreparable harm absent a stay of the district court's order.  The warden argues that "[c]omity and federalism will be turned on its head" should we not stay Smith's release pending appeal. (No. 25-3383, Appellant's Mot. to Stay, D. 10, at 20.)  We are unpersuaded.

We recognize that the state has a "significant interest in enforcing its criminal judgments[.]" *Nelson v. Campbell*, 541 U.S. 637, 650 (2004).  Given this interest, we granted the state an accommodation by issuing Smith a conditional writ of habeas corpus, permitting the state to remedy the specific constitutional violation that we identified. *See Jennings*, 574 U.S. at 285–86 (Thomas, J., dissenting).  Thus, we already afforded the state an opportunity to protect its

interests and, while we do not yet evaluate whether the same constitutional error infected Smith's retrial, we note that the district court determined that Smith's retrial "suffer[ed] from the same constitutional violation that [we] found in his first." (Op. & Order, R. 58, PageID 3968.)

In the habeas context, states also have an interest in continued custody and rehabilitation, which is "'strongest where the remaining portion of the sentence to be served is long, and weakest where there is little of the sentence remaining to be served.'" *United States v. Bass*, 843 F. App'x 733, 738 (6th Cir. 2021) (quoting *Hilton*, 481 U.S. at 777). Although Smith has already served more than nine years, he has substantial time left to serve. Before Smith's retrial, however, the state offered him a plea deal that would have released him based on time served. This plea offer undercuts the state's interest in continuing custody.

The warden also argues that Smith's risk of flight is "monumental" and that it "may be unable to regain custody of Smith if he is allowed to leave the custody of the Warden as a free man." (Appellant's Mot. to Stay, D. 10, at 21–22.) As stated above, we acknowledge that Smith has much of his sentence left to serve, which may create an incentive to flee. But the district court imposed a condition of location monitoring during the pendency of the appeal, mitigating the risk of flight.

On balance, this factor favors a stay, but we agree with the district court that the force of this factor is diminished.

## C.

We next turn to any relative harm the issuance of a stay would cause other interested parties. The other interested parties are Smith and Tolliver.[4]

---

[4] Although Smith is clearly an interested party, the dissenting opinion altogether disregards any relative harm he would suffer from the issuance of a stay. Instead, the dissenting opinion again considers the state's interest. Any analysis

The interest of a habeas petitioner in release pending appeal is "always substantial[.]" *Hilton*, 481 U.S. at 777. Smith has been incarcerated for more than nine years while maintaining his innocence. We granted Smith a conditional writ of habeas corpus, an extraordinary remedy that serves as "a bulwark against convictions that violate 'fundamental fairness.'" *Engle v. Isaac*, 456 U.S. 107, 126 (1982) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 97 (1977) (Stevens, J., concurring)). Then, finding that the state court failed to comply with the conditional writ, the district court granted Smith an unconditional writ of habeas corpus. We may, upon a full review of the merits, conclude that the state complied with our conditional writ and that the district court's unconditional writ was improperly granted. At this stage, however, Smith remains imprisoned subject to an invalid conviction, and we are not persuaded by the warden's arguments to the contrary. Under these circumstances, Smith's continued incarceration constitutes severe harm. *See Fay v. Noia*, 372 U.S. 391, 440–41 (1963) ("Those few who are ultimately successful [in obtaining a writ of habeas corpus] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation."), *overruled on other grounds*, *Wainwright*, 433 U.S. at 85.

Tolliver's interests do not sway this factor. Like the district court, we recognize that Tolliver has an interest in the matter even though she has left Ohio, failed to attend the federal proceedings, and did not provide any statement to the district court. The district court, however, imposed release conditions to protect her interests: a prohibition on any indirect or direct contact between Smith and Tolliver.

Even considering Tolliver's interests, this factor favors release.

---

of the state's interest should be limited to the second factor. The analysis for factor three is confined to any harm to the other interested parties—Smith and Tolliver.

D.

Finally, we evaluate any resulting harm to the public interest.

On one hand, "the public [] has a compelling interest in the State not continuing to incarcerate individuals who have not been accorded their constitutional right to a fair trial." *See Miller v. Stovall*, 641 F. Supp. 2d 657, 670 (E.D. Mich. 2009) (internal quotation omitted). Preventing the violation of constitutional rights is "always in the public interest[.]" *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001) (internal quotation omitted). Serving that interest, the writ of habeas corpus acts as a "guard against extreme malfunctions in the state criminal justice systems[.]" *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment).

We granted Smith the extraordinary remedy of a conditional writ of habeas corpus when we concluded that "Ohio courts impermissibly excused th[e] flagrant violation of Smith's right to due process." *Smith*, 2024 WL 3596872, at *12. That writ did not "permit [Ohio] to hold [Smith] under a new judgment infected by the same constitutional violation that justified the order's entry in the first place." *See Jennings*, 574 U.S. at 288 (citation modified) (Thomas, J., dissenting). Again, "[s]uch an interpretation of habeas judgments would render the writ hollow." *Id.* Here, the district court concluded that the same constitutional violation that justified our grant of habeas relief infected Smith's retrial. The public thus has a compelling interest in Smith's release.

On the other hand, the public has an interest in safety from anyone who poses a serious threat. Mindful of this interest, the district court imposed a location monitoring condition during the pendency of the appeal. The warden nonetheless argues that the public interest favors a stay because "a dangerous violent criminal will be released from custody[.]" (No. 25-3383, Appellant's Mot. to Stay, D. 10, at 22.) But as noted above, the state would have released Smith if he had

16

accepted its plea offer. The state's willingness to release Smith undermines the warden's argument. In offering a plea of time served, the state did not believe any risk to the public posed by Smith demanded his continued incarceration.

Therefore, the public interest factor favors release.

### III.

Accordingly, we deny the warden's motion to stay the district court's order granting an unconditional writ, grant Smith's motion to vacate the administrative stay, and order the district court to dissolve its administrative stay and effectuate its order releasing Smith from custody, effective immediately. This order disposes of all pending motions regarding the issue of Smith's release.

THAPAR, Circuit Judge, dissenting. A post-conviction writ of habeas corpus is a limited remedy. Courts may grant it only in the rarest of cases, and only to correct an extreme malfunction of a state's justice system. The first time we heard this case, today's majority granted this extraordinary form of relief to David Smith, who had been convicted of attempted murder and other crimes. Ohio then removed Smith from prison, set a bond, and gave him a new trial. Under binding precedent, those actions extinguished our court's jurisdiction over Smith's habeas petition.

But now that Smith has been convicted a second time, the majority grants Smith relief yet again, without any state-court review. Today's decision marks a severe and unprecedented intrusion onto state sovereignty. The majority asserts a general supervisory power over state-court proceedings, in defiance of Supreme Court precedent and principles of federalism. Because I would not act without jurisdiction to order the release of a violent criminal who has twice been convicted of attempted murder, I respectfully dissent.

I.

This appeal stems from David Smith's attempt to murder Quortney Tolliver. Smith agreed to drive Tolliver to Cleveland so that the pair could buy drugs. But on the morning he was supposed to pick up Tolliver, Smith walked into her home and brutally attacked her. He beat her over the head with a hammer, causing her to collapse. He then robbed her of all the cash he could find before leaving her unconscious on the floor.

An Ohio jury convicted Smith of attempted murder, felonious assault, aggravated robbery, and aggravated burglary. He was sentenced to 22 years in prison. But last July, a majority of this panel granted Smith a conditional writ of habeas corpus. *Smith v. Davis*, No. 23-3604, 2024 WL 3596872, at *1 (6th Cir. July 21, 2024). The majority thought prosecutors violated Smith's due-process rights by allowing Tolliver to identify Smith as the person who attacked her. *Id.* In the

majority's view, Tolliver's identification of Smith as her attacker was unreliable, since police officers procured that identification through suggestive methods while Tolliver was recovering from a coma. *Id.* So the majority granted habeas relief—but with a condition. Ohio could prevent the writ's issuance by prosecuting Smith in a new trial without using Tolliver's identification of Smith as the person who attacked her on October 16, 2015. *Id.* at *12.

At Smith's re-trial, the state presented the same overwhelming evidence of Smith's guilt that it put on in the first trial. The difference? This time, consistent with our court's instructions, Tolliver never testified that Smith attacked her on October 16, 2015. And sure enough, a new jury convicted Smith a second time.

After his second trial, Smith came straight to federal court without exhausting his state-court appeals. He asked the district court to grant him an unconditional writ of habeas corpus. Smith argued that, at his re-trial, Ohio let prosecutors introduce Tolliver's identification of Smith as her attacker, which he said violated the Sixth Circuit's previous ruling. The district court granted Smith's motion and issued an unconditional writ of habeas corpus.

But the district court stayed its order for 75 days. This pause, which the court styled as an "administrative stay," meant that Smith would remain in prison for at least 75 days while Ohio appeals the district court's grant of habeas. Ohio has filed that appeal, which is pending before this court.

For his part, Smith promptly moved this court to vacate the district court's decision to stay its order for 75 days. The majority grants that motion. But this court has no authority to give Smith this extraordinary form of relief. Instead, we should have granted Ohio's motion for a complete stay of the district court's habeas order for as long as it takes us to consider the merits of Ohio's underlying appeal.

19

II.

Although labeled an "administrative stay," the district court's 75-day pause really operates as a time-limited stay pending appeal. The length of the so-called administrative stay "force[s]" us to conclude that it is "effectively" a "stay pending appeal." *United States v. Texas*, 144 S. Ct. 797, 800 (2024) (Barrett, J., concurring in denial of applications to vacate stay). Smith has filed an emergency motion asking us to "stay" this stay. ECF No. 7. In effect, Smith asks us to vacate the 75-day stay. By contrast, Ohio has asked us to transform the district court's stay from a time-limited one (lasting for 75 days) into an indefinite one (lasting for as long as Ohio's appeal of the district court's grant of habeas remains pending).

The "general standards governing stays of civil judgments" also govern applications to stay habeas orders. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In evaluating both Smith's motion to vacate the stay and Ohio's motion to extend it, we apply *Nken v. Holder*'s four-factor test. *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 763 (2021) (per curiam) (citing *Nken*, 556 U.S. 418 (2009)); *cf. Certain Named & Unnamed Non-Citizen Child. & Their Parents v. Texas*, 448 U.S. 1327, 1330 (1980) (Powell, J., in chambers) (noting that the principles governing an application to stay a lower-court judgment "are equally applicable when considering an application to vacate a stay").[1]

First, the stay applicant must show a likelihood of success on the merits of the underlying appeal. *Nken*, 556 U.S. at 434. Second, the applicant must show that it will suffer irreparable harm without a stay. *Id.* For purposes of both motions, Ohio is the "stay applicant" that bears the

---

[1] The majority invokes a purported presumption that a successful habeas petitioner should be released from custody pending the state's appeal. Order at 5 (citing Fed. R. App. P. 23(c)). The Supreme Court has explained that we must afford "a presumption of correctness" to the district court's "initial custody determination," whether that determination "directs release or continues custody." *Hilton*, 481 U.S. at 777. But that presumption is "overcome" if "the traditional stay factors so indicate." *Id.* And here, because the traditional *Nken* factors counsel in favor of a full stay pending appeal, we should stay the district court's order throughout the appeal.

burden of satisfying these factors. *Id.*; *see also In re MCP No. 165*, 21 F.4th 357, 368 (6th Cir. 2021), *abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. DOL*, 595 U.S. 109 (2022). After all, Smith wants to dissolve the stay, while Ohio wants to extend it indefinitely—or at a minimum, leave it in place for 75 days. So Ohio bears the burden of demonstrating likelihood of success on the merits and irreparable harm.

If those two factors are satisfied, courts assess (3) the relative harm to the parties of granting a stay and (4) the public interest. *Id.* These factors merge where, as here, a governmental party is involved. *Nken*, 556 at 434–35.

The district court did not abuse its discretion in issuing a 75-day stay. On the contrary, Ohio is entitled to an indefinite stay of the district court's order pending appeal.

A.

Start with the first factor, likelihood of success on the merits. Ohio is entitled to prevail in its appeal of the district court's grant of unconditional habeas relief. The district court's order granting Smith's motion to enforce the conditional writ can't stand, since the district court lacked subject-matter jurisdiction to entertain that motion in the first place.

Our precedent identifies two circumstances that divest a district court of jurisdiction to enforce a conditional writ of habeas corpus. First, a district court loses jurisdiction if the state vacates the habeas petitioner's unconstitutional conviction that formed the basis of the conditional writ. *Eddleman v. McKee*, 586 F.3d 409, 413 (6th Cir. 2009). Second, a district court loses jurisdiction if the state complies with the condition specified in the federal court's conditional writ. *Gentry v. Deuth*, 456 F.3d 687, 692 (6th Cir. 2006). If *either* of these circumstances exists, then the district court loses jurisdiction.

Here, both circumstances are present. First, Ohio vacated Smith's conviction before it re-tried him. That vacatur meant that Smith was no longer confined under an unconstitutional "judgment" within the meaning of 28 U.S.C. § 2254. So the district court lacked jurisdiction. Second, even if Smith's conviction hadn't been vacated, the district court lacked jurisdiction. Why? Because Ohio complied with this court's order prohibiting the state from introducing Tolliver's identification of Smith as her attacker at Smith's new trial. In fact, Smith's main argument—that Tolliver's testimony that she saw Smith on the morning of the attack amounts to a claim that Smith attacked her—is a new legal theory that Smith has never raised. Thus, he must give the Ohio courts an opportunity to rule on this new theory by exhausting his state-court remedies. Until he does so, our court lacks jurisdiction to act.

1.

Start with the first reason why the district court lacked jurisdiction over Smith's motion to enforce: After Smith won a conditional writ of habeas corpus from this court, Ohio vacated Smith's unconstitutional conviction.

a.

Smith sought habeas relief under 28 U.S.C. § 2254. Under that statute, federal courts have jurisdiction to entertain habeas petitions—but only from persons confined "pursuant to the judgment of a State court." 28 U.S.C. § 2254(a); *Eddleman*, 586 F.3d at 412. The moment that a prisoner is no longer held under an unlawful *judgment*, federal jurisdiction over that prisoner's habeas petition disappears. *Eddleman*, 586 F.3d at 413. And when a state vacates the conviction that a federal court has held unconstitutional, the corresponding unconstitutional judgment is extinguished. So a federal court would no longer have jurisdiction to enforce an order of conditional habeas relief. *Id.*

*Eddleman* is this circuit's clearest illustration of these principles. That case returned to our court after a previous panel authorized a conditional writ of habeas corpus. *Id.* at 411. After the conditional writ issued, the state transferred Eddleman from prison to jail, since it was now confining him under the original criminal information—not a conviction. The state began to re-prosecute Eddleman. Before the re-trial, Eddleman moved the district court to convert the writ of habeas corpus from conditional to unconditional. *Id.* at 411–12. He argued that the state flouted the writ's condition because it waited too long to re-try him, in violation of the Sixth Circuit's requirement that Eddleman be re-tried "within a reasonable time." *Id.* The district court agreed with Eddleman and granted him an unconditional writ of habeas corpus.

This court reversed. We held that the district court lacked jurisdiction even to entertain Eddleman's motion, since Ohio had vacated Eddleman's unconstitutional conviction that was the basis for federal habeas jurisdiction. Once the state vacated its conviction, the unconstitutional judgment was gone. *Id.* at 413. And since the federal court's jurisdiction hinged on the unlawful judgment, federal jurisdiction disappeared, too. *Id.*

What's more, when a state vacates the successful habeas petitioner's conviction, the state may re-try that petitioner under the original criminal indictment that led to the original conviction. That's because the power to grant a prisoner habeas relief under § 2254 is not a power to "release him forever from the underlying charge." *Id.* Instead, it is a power only to "release him from custody pursuant to the unconstitutional judgment." *Id.* If Eddleman wanted to contest the state's actions at the re-trial, he could do so. But he first needed to exhaust his remedies in state court before filing a new, separate habeas petition in federal court.

23

b.

Under *Eddleman*, the district court lacked jurisdiction to entertain Smith's habeas petition because Ohio vacated Smith's conviction.

i.

When there's no formal order declaring that a conviction was vacated, courts look to the totality of the circumstances to determine if the conviction was vacated. *Id.* at 412. And when a state appoints counsel for a conditionally successful habeas petitioner, sets a bond, and sets a trial date, the petitioner's conviction has been vacated. *Fisher v. Rose*, 757 F.2d 789, 791 (6th Cir. 1985). In *Fisher*, those facts confirmed that the habeas petitioner "was no longer in custody pursuant to the constitutionally defective judgment of conviction, but was being held pursuant to the indictment." *Id.* Thus, *Fisher* held that the district court erred by enforcing the conditional writ. *Id.* at 792; *accord Eddleman*, 586 F.3d at 413–14 (discussing *Fisher*).

Those facts are present here. Just ten days after the district court issued its conditional writ of habeas corpus pursuant to this court's mandate, the state trial court held a status conference and set a trial date for Smith, who was represented by counsel. R. 35 (district court enters conditional writ on September 20, 2024); R. 47-4, Pg. ID 3794 (showing that status conference took place ten days later, on September 30); *id.* at Pg. ID 3796 (setting tentative trial date). And crucially, the district court set a bond for Smith. At the September 30 status conference, the court recognized that it needed to set a bond. It then heard arguments from the parties about the amount of the bond. Finally, the court set a $500,000 bond, payable by cash or surety, and subjected Smith to GPS monitoring. R. 47-4, Pg. ID 3802. "If [Smith] had been able to meet the requirements of his bond, he would have been released from detention." *Fisher*, 757 F.2d at 791.

That fact, along with the fact that Smith received a trial date, confirms that Ohio vacated Smith's conviction. *Id.* If Ohio meant to keep Smith's conviction for attempted murder in place, it would not have moved Smith from state prison (under the warden's custody) to county jail (under the sheriff's custody). And it would not have given Smith the opportunity to *walk free from jail altogether* on a monetary bond for the months leading up to his re-trial. Pretrial detainees are commonly released on monetary bonds; convicted prisoners serving out a sentence are not.

ii.

In concluding that Smith's conviction remained intact, the majority relies on a "warrant for removal," issued by a deputy clerk of the state trial court, that authorized authorities to transport Smith from prison to jail. Order at 12; R. 47-2, Pg. ID 3791. In the majority's view, this document cuts against a finding of vacatur, since the document cites provisions of Ohio law that refer to the transportation of a convicted felon. So, the logic goes, the state must have thought Smith was a convicted felon when it moved him to jail.

Yet viewing that document in isolation omits the crucial context that is necessary to understand it. The warrant for removal that the deputy clerk used to move Smith is a boilerplate form. That form cites Ohio statutes applicable to convicted felons because the form is often used to transport convicted felons. But that is not its exclusive use. And here, the record makes clear that the use of the form was not tailored to Smith's legal situation. Rather, it was simply used to move him out of prison.

How do we know that? The form says that Smith would be returned to prison "at the conclusion of said hearing for which he is being removed." R. 47-2, Pg. ID 3791. That boilerplate statement contradicts the clerk's entry on the form, which makes clear that Smith would be held indefinitely "for further proceedings." *Id.* What's more, the deputy clerk requested Smith's

25

transfer on September 20, 2024—the same day on which the federal district court entered its conditional writ of habeas corpus. This wasn't done for any particular hearing. Rather, at a status conference in trial court ten days later, the judge confirmed that "[Smith] is here now in our jail" and emphasized that "[w]e brought Mr. Smith back based upon the federal ruling on his habeas." R. 47-4, Pg. ID 3795.

The majority invokes the district court's conclusion that the "hearing" referenced on the form was Smith's new trial, but that's incorrect. Indeed, the state court hadn't even set a trial date when Smith was transferred from prison to jail. *See, e.g.*, *id.* at Pg. ID 3796 (September 30, 2024, status conference discussing potential trial dates). And Smith's trial didn't begin until February 24, 2025—months after he was transferred. So Ohio released Smith from prison and confined him in county jail throughout his re-prosecution—not any particular "hearing for which he is being removed." *Id.* at Pg. ID 3795.

In fact, Smith's transportation from prison to jail actually *supports* the conclusion that Smith's conviction was vacated. If Ohio meant to keep Smith's conviction for attempted murder in place, it would not have moved Smith from state prison (where convicted felons are kept) to county jail (where pretrial detainees are held) the moment the federal court issued habeas relief. And there never would have been a discussion about bond, let alone the setting of an actual bond, if he was still under the judgment.

There is no doubt Ohio could have been more meticulous in documenting all this. Indeed, under best practices, courts would enter a formal order stating that the conviction had been vacated. *Eddleman*, 586 F.3d at 412.

But the failure to follow best practices is not fatal. For federal courts to require as much would put form over substance (something we definitely can't do in the habeas context). Our court

has held as much. In *Eddleman*, this court held that the state had vacated the petitioner's conviction even though the "record in the trial court" was "devoid of any written order to that effect." *Id.* (citation omitted). The absence of a formal order vacating the conviction doesn't compel the conclusion that Smith's conviction remained in place. *Id.* On the contrary, courts look to the whole record to determine whether the facts indicate that the conviction was vacated. *Id.* And here, the facts establish that Ohio vacated Smith's conviction.

iii.

The majority seems to worry that if a state court can simply vacate the conviction and re-try someone, habeas will be a toothless tiger. In doing so, the majority misunderstands the limited nature of the extraordinary writ of habeas corpus. Section 2254 allows federal courts to order a prisoner released "from custody pursuant to an unconstitutional judgment." *Id.* at 413. And that is what the majority ordered here, with a condition: the state could prevent Smith's release by re-trying him within 180 days. The state complied with both conditions. When it did so, our authority came to an end. There is nothing "remarkable" about that.

In determining that the conviction was vacated, I looked to binding precedent like *Fisher*. (Remember, our court held in *Fisher* that when a state court sets a bond for a successful habeas petitioner and then sets a trial date, the petitioner's conviction has been vacated.) The majority says my reliance on *Fisher* is misplaced. Confusingly, however, the majority also concedes that *Fisher* is relevant and "remains binding precedent." Order at 11. We should apply that binding precedent here.

More fundamentally, the majority repeatedly expresses concern with the notion that, by vacating the defendant's conviction and pursuing a re-trial, states can divest federal courts of the power to supervise how a state court conducts a re-trial following the entry of a conditional writ.

27

*Id.* at 10–11, 16. But the Supreme Court has reminded us for fifty years that 28 U.S.C. § 2254 does not "permit a federal habeas court to maintain a continuing supervision over a retrial conducted pursuant to a conditional writ." *Pitchess v. Davis*, 421 U.S. 482, 490 (1975). However much federal courts might wish to exercise a continuing jurisdiction over state-court proceedings that follow a conditional writ, Congress has determined that doing so would impose too great a cost on crime victims and state sovereignty.

And in any event, continued supervision by the original habeas court isn't the only way to ensure that the state trial court complies with the federal court's interpretation of the Constitution. A defendant still has plenty opportunities to challenge the re-trial's constitutionality. The defendant can pursue direct appeals through the state-court system, where he may argue that the re-trial violated the Constitution as interpreted by the original habeas court. Those state appellate courts are competent to correct any errors made by the trial court, and we may not assume "either the incompetence or the bad faith of [Ohio's] state judiciary." *Eddleman*, 586 F.3d at 413. Then, after exhausting the state appellate process, the defendant may petition the United States Supreme Court for a writ of certiorari. If that fails, the defendant can pursue habeas, including in federal court. Ultimately, federal habeas courts should not act "out of turn" by short-circuiting the normal process for correcting alleged trial errors. *Id.*

c.

So both the facts and our precedent confirm that Smith's conviction was vacated. But even if there were doubt about whether Smith's conviction had been vacated, principles of constitutional avoidance should lead us to conclude as much. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 128 (1810). Ohio granted Smith a new trial. That fact alone is powerful evidence that Smith's

underlying conviction has been vacated, because a serious constitutional problem would arise if the conviction remained intact.

Under the Double Jeopardy Clause of the Fifth Amendment, no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see also Benton v. Maryland*, 395 U.S. 784, 795–96 (1969) (explaining that this clause applies to states). The Double Jeopardy Clause bars a state from prosecuting someone a second time "for the same offense after conviction." *North Carolina v. Pearce*, 395 U.S. 711, 717(1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989). So if a state wants to re-try a defendant for the same offense that led to an earlier conviction, the earlier conviction first must be vacated. *See Burks v. United States*, 437 U.S. 1, 9 (1978).

Thus, if Ohio did *not* vacate Smith's conviction before re-trying him for the same offense, then Smith's second trial violated the Double Jeopardy Clause. Under the time-honored principle of constitutional avoidance, that's not a conclusion we should reach lightly. *Fletcher*, 10 U.S. (6 Cranch) at 128. Yet the majority lurches to do exactly that.

The majority retorts that this argument doesn't take account of the fact that the writ was conditional. Order at 12–13. But the majority misunderstands the difference between a conditional writ and an unconditional writ. Under either writ, the state court may re-try the defendant. *Eddleman*, 586 F.3d at 413; 2 Hertz & Liebman, *Federal Habeas Corpus Practice & Procedure* § 33.2 & n.11. Unlike an unconditional writ, a conditional writ gives the state a grace period to do so without releasing the defendant. *Gillespie v. Warden*, 771 F.3d 323, 329 (6th Cir. 2014). Double jeopardy has nothing to do with the type of writ and everything to do with the re-trial. The double-jeopardy problem only arises when a state conducts the *re-trial without first vacating* the unconstitutional conviction.

29

Of course, vacating the unconstitutional conviction deprives the habeas court of immediate supervisory jurisdiction over a subsequent re-trial. *Id.* Given that fact, perhaps the majority is objecting to a broader implication of my argument: whenever a state re-tries a habeas petitioner, the federal court that issued habeas relief lacks the supervisory power to oversee the re-trial. After all, whenever a state re-tries a successful habeas petitioner, we should presume that the state vacated the underlying conviction (since a serious constitutional problem would arise if no vacatur occurred). But when the underlying conviction has been vacated, our job is done until the normal process runs its course.

That conclusion isn't a product of any new ground broken by this dissenting opinion. Rather, it's a function of the already established doctrines that (1) a state can always re-prosecute a petitioner who wins habeas relief, whether conditional or unconditional, and (2) a state trial court can always deprive the original habeas court of jurisdiction to supervise a re-trial by vacating the prisoner's conviction. *Eddleman*, 586 F.3d at 413.

Finally, the majority argues that, under my view, there would never be any reason to issue a conditional writ. Order at 13. But that's not accurate. Conditional writs serve an important purpose. They give the state a specified period—for example, 180 days—to decide whether the state will (a) let the petitioner go free or (b) immediately re-arrest the petitioner following his release from prison, which starts the trial-procedure clock all over again. Of course, federal courts cannot use conditional writs to evade a congressional ban on asserting a continuing jurisdiction over state-court proceedings.

\* \* \*

The district court lost jurisdiction over Smith's habeas petition when Ohio vacated his conviction by transporting him from prison to jail, giving him a re-trial, and setting bond.

*Eddleman*, 586 F.3d at 413–14; *Fisher*, 757 F.2d at 791. That lack of jurisdiction means the district court had no authority to enforce the conditional writ of habeas by making it absolute. *Eddleman*, 586 F.3d at 413. By reaching a contrary conclusion, the majority impermissibly intrudes on state sovereignty by exercising a general power of "supervisory authority over state trial courts." *Jennings v. Stephens*, 574 U.S. 271, 278 (2015).

2.

There is a second, independent reason why the district court lacked jurisdiction over Smith's motion to enforce the conditional writ. At Smith's second trial, the prosecution complied with the Sixth Circuit's judgment from July 2024. Our court ordered the state to either release Smith or re-prosecute him without utilizing Tolliver's identification of Smith as her attacker. Ohio did exactly that. Because the state complied our court's order, we must wait for the normal appellate process to run its course. *Gentry*, 456 F.3d at 692. In other words, we lack jurisdiction to act.

Start with the scope of our court's order. When the panel instructed Ohio to prosecute Smith "without utilizing Tolliver's identification of Smith," it was referring to Tolliver's identification of Smith *as her attacker*. *Smith*, 2024 WL 3596872, at *12. The panel's opinion stresses that.[2] For example, the panel opinion says that Smith only moved to suppress "any eyewitness identification and testimony by [Tolliver] identifying [Smith] out of court and in-court *as her assailant* on October 16, 2015." *Id.* at *3 (citation omitted) (emphasis added). In granting

---

[2] *See id.* at *1 ("Although Tolliver did not identify Smith *as her assailant* at the time, she did positively identify him several months later."); *id.* ("Smith filed a motion to suppress Tolliver's identification of him *as her assailant*"); *id.* at *2 n.2 (criticizing officer for telling Tolliver that Smith "was the person who attempted to murder her with a hammer"); *id.* at *3 (explaining that Smith moved to suppress "any eyewitness identification and testimony by Quortney Tolliver identifying Defendant . . . *as her assailant* on October 16, 2015"); *id.* at *6 (criticizing the officer for telling Tolliver "that Smith brutalized her with a hammer"); *id.* at *10 (casting doubt on Tolliver's claim that "Smith was her *attacker*"); *id.* (discounting Tolliver's identification of Smith "*as her assailant*"). All emphases in these quotations have been added.

habeas relief, the court did not, and could not, grant any relief beyond what Smith himself had asked for. So the question becomes: At the re-trial, did Ohio allow Tolliver to identify Smith as her attacker?

It did not. During the second trial, Tolliver never testified that Smith attacked her. The prosecution never sought that testimony, the trial court never allowed it, and the jury never heard it. The Ohio courts complied with the Sixth Circuit's order, full stop.

Of course, our court's order didn't require Tolliver to sit silently during the trial. The order didn't prohibit Tolliver from testifying about other topics, so long as she didn't identify Smith as the person who attacked her. Consistent with this requirement, Tolliver testified that Smith arrived at her home on the morning of the attack. Smith challenges that testimony and the prosecution's summary of it, arguing that this testimony is equivalent to an identification of Smith as the attacker.

His challenge is meritless. In granting habeas relief, the majority excluded the suggestive identification procedure that caused Tolliver to identify Smith as her attacker. But suppose that suggestive procedure had never happened. In that case, Smith's original trial would have looked exactly like his re-trial. After all, plenty of evidence—unrelated to the suggestive identification— shows that Smith arrived at Tolliver's house on the morning of the attack. So even without the suggestive identification, Tolliver would still have testified that she knew Smith, arranged to take a drive with him on the morning of the attack, and received texts and calls from Smith letting her know that he had arrived at her house. That's exactly what happened at Smith's re-trial. Since the re-trial proceeded as it would have if no constitutional violation had ever occurred, Smith's objection to Tolliver's testimony at the re-trial is disconnected from the objection that led him to win habeas relief in the first place. This court lacks jurisdiction to entertain Smith's new request for expanded relief.

32

a.

Consider what happened at the re-trial. Tolliver testified that she first met Smith a few weeks before the attack. That was uncontroversial. In fact, Smith himself relied on that same evidence in his first appeal to our court, since he wanted to attack the reliability of Tolliver's identification by showing that Tolliver had known Smith for only a brief period before the attack. What's more, the panel majority relied on this evidence in granting Smith a conditional writ. *Smith*, 2024 WL 3596872, at *9.

Immediately after discussing her first meeting with Smith, Tolliver identified Smith (whom she knew as "D") as the defendant in the courtroom:

> Q. All right. Did he bring you back to Ravenna?
> A. Yes.
> Q. All right.
> And did you meet him again before October 16th?
> A. No.
> Q. Okay.
> Did he become a customer?
> A. Yes.
> Q. All right.
> This person that you knew as D, is he in the courtroom today?
> A. Yes.
> Q. Can you please describe for us where he's sitting and what he's wearing for the record?
> A. He has on a brown and — suit with a yellow shirt, bald black man.
> Q. Okay.

R. 41-2, Pg. ID 3223.

Nowhere in this passage does Tolliver identify Smith as her attacker. Instead, Tolliver simply identifies Smith as the person she "knew as 'D.'" *Id.*

Next, Tolliver testified about her interactions with Smith in the moments *before* the attack. She testified that on the day of the attack, she went to the door of her home to let someone in. When she opened the door, she saw someone standing in the doorway. The prosecution then asked

33

who that person was. Tolliver responded, "D"—that is, David Smith, the same person she had identified in the courtroom earlier in the trial. Put it all together, and Tolliver testified that she saw Smith standing in the doorway in the moments before she was attacked.

The prosecution picked up on this theme. In opening statements, the prosecutor linked Smith's arrival at Tolliver's house and the attack:

> Quortney will tell you that David lets her know that he arrives and that he's at the trailer park and that they're planning to go. Then she hears a knock at her trailer, that she opens the door. She sees David. And more importantly, she'll tell you she sees no one else, nobody but David Smith. Then she opens the door, or he opens the door, and she turns to get her shoes on and she is struck from behind by what investigators later believe is a hammer in the back of her skull.

R. 41-1, Pg. ID 3191. And in closing argument, the prosecution sounded a similar note:

> And, again, don't miss the big elephant in the room, Quortney Tolliver's own testimony. The last person she saw, the person she was gonna do a deal with, the person that she opens the door for or he opens the door, and then she wakes up in a hospital almost beaten to death.

R. 43-1, Pg. ID 3626–27.

The district court erred when it held that these passages amounted to an identification of Smith as Tolliver's assailant. Nowhere in these passages does Tolliver (or the prosecution) say that Smith attacked her. Instead, Tolliver says something much different: she interacted with Smith in the moments *before* her attack. And who perpetrated that attack? Tolliver never said. That was something for the jury to infer.

b.

Smith rejects the state's distinction between (a) prohibited testimony that Smith was the attacker and (b) Tolliver's actual testimony that Smith arrived at her home before the attack. Smith's main argument is that this testimony was the substantial equivalent of an identification of Smith as Tolliver's attacker, since he fears it enabled the jury to infer that he was the assailant.

34

But throughout this habeas litigation, Smith has objected to Ohio's use at trial of Tolliver's testimony that Smith was the person who attacked her on October 16, 2015. That was the basis of his habeas petition. That was the constitutional violation that this court identified. And that was what our panel prevented Ohio from introducing at the re-trial.

By advancing this argument, Smith effectively asks our court to broaden his relief by preventing Tolliver from saying *anything* about Smith's interactions with her on the morning of the attack. But this court has no jurisdiction to entertain Smith's request for an expanded habeas writ. If Smith wants to bar Tolliver from testifying that she saw Smith arrive at her house on the morning of the attack, he must exhaust his state-law remedies by presenting that theory to the state court before attempting to file a second federal habeas petition. *Wilson v. Mitchell*, 498 F.3d 491, 498 (6th Cir. 2007).

At Smith's first trial, Tolliver testified that Smith was the person who attacked her. The prosecutor instructed Tolliver as follows: "Go ahead and tell the Court and Jury who assaulted you. Point him out. What's his name?" R. 10-3, Pg. ID 1014. Tolliver responded, "That guy right there, David Smith." *Id.* The prosecutor followed up by asking Tolliver, "How sure are you that it was David Smith?" *Id.* at Pg. ID 1015. She responded, "One hundred percent." *Id.*

That testimony is what our panel opinion prohibited. The underlying constitutional violation that the panel opinion identified was "[t]he admission of evidence derived from a suggestive identification procedure." *Smith*, 2024 WL 3596872, at *5. In the majority's view, Tolliver's identification of Smith was unreliable, since police induced her to identify Smith as her attacker by using procedures that were too suggestive of Smith's guilt. *Id.* at *6–7, *11. Tolliver's testimony that Smith attacked her stemmed from the suggestive identification procedure.

Consistent with the panel's mandate, Tolliver did not repeat the above testimony at Smith's re-trial. Indeed, the evidence that Smith challenges now—Tolliver's testimony that Smith interacted with her shortly before the murder—was not "derived from a suggestive identification procedure." *Id.* at *5. Rather, it was "derived from" reams of texts and calls showing that Smith arrived at Tolliver's house for a drug-buying operation just minutes before Tolliver was attacked.

For example, at Smith's re-trial, the prosecution established that Smith began texting Tolliver at 11:04 a.m. on October 15—the day before the attack. They continued texting throughout the day, with Smith telling Tolliver that he wanted two grams of drugs. At 10:46 p.m. on the night of the 15th, Smith texted Tolliver that he would be coming to see her tomorrow—that is, on October 16, the day of the attack.

Then, on October 16—just hours before the attack—Tolliver texted Smith again, asking him to take her to Cleveland to buy drugs. Smith replied, "Okay." R. 41-2, Pg. ID 3253. He said he would pick her up as soon as he finished an interview. At 10:40 a.m., Smith asked Tolliver if she was ready to be picked up. Phone records show Smith called Tolliver's phone at 10:42 a.m. and 10:58 a.m. At 10:59, Tolliver responded that she needed a second before she was ready. Finally, phone records show that Smith called Tolliver at 11:21 a.m. Tolliver testified that Smith called her at 11:21 to say that he had arrived at her house. Immediately after testifying to the existence of that phone call, Tolliver stated that she opened the door and saw Smith in the moments before she was attacked.

Given all this, the jury was always going to hear evidence that Smith arrived at Tolliver's house in the minutes before the attack. After all, plenty of texts and calls established that fact. And Smith never challenged that evidence. Nor could he have challenged it. Those same text messages and phone calls were introduced at Smith's first trial, and Tolliver testified extensively

about them. But Smith never moved to suppress them. Given Smith's failure to seek suppression of Tolliver's testimony about these texts and calls, our panel would have been powerless to suppress that testimony. *Wilson*, 498 F.3d at 498.

In sum, even assuming that officers had never used a suggestive identification procedure, and even assuming that Tolliver had no idea who hit her in the head with a hammer, Tolliver would still have testified—on the basis of the texts and calls—that Smith communicated with her and drove to her house in the lead-up before the attack. Smith's interpretation of the panel's order as forbidding all references to Smith's arrival moments before the attack is therefore disconnected from the legal theory that entitled Smith to relief in the first place. If Smith wants to advance this new legal theory, he needs to exhaust his remedies in state court and then file a separate habeas petition. *Pitchess*, 421 U.S. at 490.

c.

What's the majority's response to all this? It first asserts that this court "need not address" whether Ohio complied with the conditional writ. Order at 8. The majority protests that Ohio didn't make these arguments in its motion for a stay pending appeal. But Ohio argued throughout its briefing that this court lacks subject-matter jurisdiction to entertain Smith's motion. And courts have an independent obligation to determine whether subject-matter jurisdiction exists. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

That means we must determine, on our own initiative, whether we lack jurisdiction on the ground that Ohio complied with the conditional writ. By refusing to heed this obligation, the majority settles on an astonishing position: Ohio must release Smith, even though the state court may have complied with this court's original habeas order, and even though the re-trial may have

37

been free of any constitutional error. More caution is warranted before requiring the release of a twice-convicted criminal like Smith.

Turning to the substance of my argument that Ohio complied with the conditional writ, the majority offers a tentative response. In the majority's view, Tolliver's testimony that she opened the door for Smith shortly before her attack had the "effect" of identifying Smith as the person who attacked her. Order at 9. But Tolliver didn't actually say that Smith attacked her. And as already explained, plenty of other admissible evidence—including texts and calls that Smith hasn't challenged—show that Smith arrived at Tolliver's house in the moments before the attack. That evidence would also have the "effect" of identifying Smith as the person who attacked Tolliver, but that evidence would have been admitted at trial even without the suggestive identification.

\* \* \*

Ohio complied with our court's order to proceed in a re-trial without using Tolliver's identification of Smith as her assailant. The district court erred when it purported to "enforce" this writ by making it unconditional and ordering Smith's release from prison. Ohio is entitled to succeed on the merits of the underlying appeal.

B.

Next, turn to the second *Nken* factor—irreparable harm. Ohio would suffer irreparable harm absent a stay of the district court's order. A state suffers irreparable injury whenever it's prevented from enforcing its duly enacted laws. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). It follows that a state suffers irreparable injury when it's barred from enforcing a criminal judgment entered based on a violation of one of those laws. "Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power of a State to pass laws means little

if the State cannot enforce them." *McCleskey v. Zant*, 499 U.S. 467, 491 (1991); *see also Barber v. Ivey*, 143 S. Ct. 2545, 2550 (2023) (Sotomayor, J., dissenting from the denial of application for stay) (noting that a state has an "interest in enforcing [its] criminal judgment"). Indeed, the district court itself recognized that the irreparable harm factor cut in Ohio's favor.

C.

Finally, consider the relative harm to the parties and the public interest. These factors merge, since one of the parties to this case—Ohio—is a governmental party. *Nken*, 556 U.S. at 435. And they weigh heavily for a stay pending appeal.

As common sense suggests, the public interest will suffer if Smith is released from prison while Ohio appeals. Two juries convicted Smith of attempted murder, felonious assault, aggravated robbery, and aggravated burglary stemming from his attack on Quortney Tolliver. He is guilty beyond a reasonable doubt of beating a woman with a hammer so that he could rob her and use the money to buy drugs. Releasing this violent criminal onto Ohio's streets long before the end of his rightful prison term poses a grave danger to the public. "Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). They also have an important interest in the *full* enforcement of a sentence. Indeed, the state's interest in keeping a prisoner in custody pending appeal is "strongest" when "the remaining portion of the sentence to be served is long." *Hilton*, 481 U.S. at 770. Here, Smith has over a decade left to serve on his 22-year sentence. Ohio has a strong interest in requiring him to serve that time.

And while there is always a strong public interest in preventing the violation of constitutional rights, the re-trial did not offend that interest here. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001).[3]

\* \* \*

Smith is not entitled to a stay of the district court's 75-day stay of its order pending appeal. Rather, Ohio is entitled to an indefinite stay pending appeal of the district court's grant of unconditional relief. The majority's legal error comes at the expense of our citizens and the rule of law. Today's decision results in the premature release onto Ohio's streets of a violent criminal who is factually guilty of attempted murder and aggravated robbery of drug money. And it does so without a valid jurisdictional basis. The Constitution and the people of Ohio deserve better than this. I respectfully dissent.

ENTERED BY ORDER OF THE COURT

Kelly L. Stephens, Clerk

---

[3] The majority accuses this opinion of "altogether disregard[ing] any harm [Smith] would suffer from the issuance of a stay." Order at 14 n.4. But as explained, Smith's re-trial did not violate his constitutional rights. For that reason, Smith would not suffer any legally cognizable harm from continuing to serve his duly imposed sentence during the pendency of this appeal.